EMERY WORLDWIDE AIRLINES, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Federal Express Corp., Defendant–Intervenor.

No. 01–13C.

United States Court of Federal Claims.

March 26, 2001.[1]

---

1. This opinion was issued under seal on March 20, 2001. Pursuant to ¶ 2 of the ordering language, the parties were requested to identify protected/privileged material subject to deletion. The parties responded promptly that no deletions were requested.

David P. Hendel, Vienna, VA, for plaintiff. Claude P. Goddard, Jr., Wickwire Gavin, P.C., and W. Stanfield Johnson and Frederick W. Claybrook, Jr., Crowell & Moring, Washington, DC, of counsel.

Kyle E. Chadwick, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. Eric Scharf and Kevin Calamoneri, U.S. Postal Service, of counsel.

David S. Cohen, Washington, DC, for intervenor. William F. Savarino, John J. O'Brien, Rowena E. Laxa, and C. Kelly Kroll, Cohen Mohr, L.L.P., and Connie Lewis Lensing, Federal Express Corp., Memphis, TN, of counsel.

### OPINION

MILLER, Judge.

This pre-award bid protest is before the court after argument on cross-motions for summary judgment. Emery Worldwide Airlines, Inc. ("plaintiff"), seeks to enjoin the non-competitive award of a contract by the United States Postal Service (the "USPS") to Federal Express Corporation ("intervenor"). Recently, the USPS awarded, on a sole-source basis, a seven-year contract valued at $6.36 billion to intervenor for air transportation network services to deliver the USPS's Express, Priority, and First Class mail. This contract is unprecedented not only for its dollar value, but also because it contemplates a shared-network arrangement between the USPS and intervenor. Plaintiff excepts to the USPS's determination that it was neither feasible nor appropriate to meet its needs through a competitive award. Citing statutes and the USPS's own regulations, plaintiff condemns the failure to give required notice of the contemplated sole-source award, which allegedly undercut an equitable distribution of mail among carriers or an equitable procurement. Contriving to justify an award to intervenor, the USPS, according to plaintiff, commissioned an analysis with the predetermined objective of rationalizing an award to intervenor. Plaintiff charges that the analysis upon which the USPS relied unlawfully and irrationally eliminated plaintiff from contention based on inaccurate or dated information. Most significantly, plaintiff derides the USPS for using public sources of information, rather than directly seeking it from plaintiff.

The court rules that, although the USPS clearly violated an applicable procurement regulation that mandated a specific form of pre-award notice, the elimination of plaintiff

from consideration early in the evaluation process was neither unlawful nor irrational, so that plaintiff did not have a substantial chance of obtaining an award and therefore suffered no prejudice. As a result, this sole-source procurement survives plaintiff's challenges.

## FACTS

### 1. *Parties*

The following facts are drawn from the administrative record, as supplemented. Plaintiff is an air transportation provider and has performed under various USPS air transportation network service contracts since 1989. Intervenor is one of the nation's largest providers of overnight express mail delivery. The USPS is an independent establishment of the executive branch of the Government of the United States. *See* 39 U.S.C. § 201 (1994). Under its current Air National Network ("ANET") contract and other USPS contracts for transportation of mail, plaintiff provides a fleet of 35 dedicated aircraft. The term "dedicated aircraft" refers to aircraft that are used exclusively for the transportation of the USPS's mail. The current contract with the USPS commenced on January 10, 1994, and is due to expire on January 10, 2004, with an option to extend the term of the contract for an additional ten years.

The USPS currently uses a system of dedicated networks to deliver Express, Priority, and First Class mail. An airplane in a "dedicated" network contains space that is used exclusively for this mail. The system of dedicated networks was developed piecemeal, with the result that different carriers operate different parts of the network. For example, plaintiff is the exclusive air transportation provider for the ANET contract and the Priority Mail Processing Centers. The other parts of the current system include the Western Network, operated by Kitty Hawk Air Cargo, and the Daytime Network, operated by a group of five different small carriers. Some First Class mail is also carried on commercial aircraft, which are referred to as ASYS aircraft.

The USPS assessed that the dedicated networks were inefficient, expensive, and somewhat unreliable. The cost of dedicated networks was projected to increase in future years, and the networks lacked a cohesive tracking system. The USPS also recognized that the ASYS aircraft delivered only 60% on-time performance because some passenger airline routes have changed and because mail is not readily transferred at commercial air hubs. To alleviate these problems, the USPS sought a single national provider of air transportation.

### 2. *Nature of dispute*

On September 7, 2000, Postmaster General William Henderson held a press conference on the topic of "FedEx Strategic Alliance Discussions." *See* Transcript of Postmaster General William Henderson Telecon News Conference dated Sept. 7, 2000, at 1 ("Henderson Tr."). One of the purposes of the conference was to discuss stories that had been "reported in the media," Henderson Tr. at 6, about a possible agreement between the USPS and intervenor for the transportation of mail. Postmaster Henderson answered questions on a variety of topics, including the broad parameters of a possible agreement with intervenor, *id.* at 6–7; existing contracts with other air transportation carriers, *id.* at 9; antitrust issues, *id.* at 10; union concerns, *id.* at 13; and recent losses incurred by the USPS, *id.* at 18. When asked if it was fair to say that the potential agreement with intervenor "goes far beyond any of the cooperative ventures you've got with the other air carriers," Postmaster Henderson replied, "Yes." *Id.* at 12. The following exchange also occurred:

[QUESTION]: " ... Why would you be allowed to negotiate directly with FedEx over carrying [packages currently carried under other contracts], where it has normally moved in the past under contracts that were put out for bid?"

[Postmaster Henderson]: Well, it would be under a strategic alliance and we wouldn't take over the whole network in one fell swoop.... And, you know, the strategic alliance, there's no one else that would qualify for all of this. But we haven't done

that yet. [I]t depends on what kind of efficiencies we can gather from Federal Express.

*Id.* at 20. Reporters from national publications such as *The Wall Street Journal, The Washington Post,* and CNNFN.com, among others, participated in the press conference.

The USPS requested, by letter dated October 17, 2000, that plaintiff provide an estimate of termination for convenience costs. On December 4, 2000, plaintiff's President and Chief Operating Officer Kent T. Scott wrote to A. Keith Strange, Vice President Purchasing and Materials for the USPS. Mr. Scott noted that the USPS was in discussions with intervenor for the "air carriage of Express and Priority Mail, and possibly other mail." Mr. Scott expressed plaintiff's interest in participating "in such discussions as a potential supplier." The USPS eventually met with plaintiff on December 14, 2000, and discussed future air transportation needs. On December 18, 2000, Mr. Scott wrote to J. Dwight Young, Manager Transportation Purchasing for the USPS, requesting certain specific information for use in preparing a proposal to respond to those needs. On December 24, 2000, Mr. Young e-mailed plaintiff stating that "[a]lthough we are not actively seeking a proposal from Emery, given our long standing business relationship I am providing the information you have requested." Mr. Young provided requirements in five categories, including one titled "Network Preference (shared to dedicated)." This section stated that "the decision of [sic] regarding the network type (Shared/dedicated or a combination) is up to the supplier." (While a "dedicated" network is a network of aircraft that transports only USPS mail, a "shared" network would transport USPS mail and that of the air carrier's own commercial client base.) Mr. Young also advised plaintiff that the USPS must receive by January 3, 2001, any proposal addressing the stated needs. Plaintiff made further requests for information in order to prepare a proposal, but was unable to submit any proposal by the January 3, 2001 deadline.

On January 5, 2001, plaintiff filed its suit and moved to enjoin the award of a contract by the USPS to intervenor for air transportation network services procured on a sole-source basis. The hearing on plaintiff's application for a temporary restraining order was held on January 8, 2001. Plaintiff, defendant, and intervenor presented witnesses. Testifying for the USPS were officials who made the decision to award the contract on a non-competitive sole-source basis. Defendant also moved to dismiss plaintiff's protest on the grounds that plaintiff lacked standing to bring the protest because it was not an "interested party;" that the court lacked subject matter jurisdiction because the USPS was not a "Federal agency" under the injunctive provisions of the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994 & Supp. V 1999); and that the court lacked subject matter jurisdiction because the action could not be brought against the USPS in its own name. The court allowed plaintiff to amend its complaint to name the United States as defendant, ruled that plaintiff was an "interested party," and deferred ruling on defendant's other ground for dismissal.

During the January 8 hearing, defendant presented a document entitled "Justification for Noncompetitive Purchase with Federal Express Corporation" (the "Justification") signed January 7, 2001, on behalf of the USPS by Paul E. Vogel, Vice President Network Operations Management, Mr. Strange, and Mr. Young, who had been designated Contracting Officer. The Justification outlined nine USPS requirements for transporting Express, Priority, and First Class mail,[2] as follows:

- A single[,] integrated, national air transportation network, operated by a single, national contractor;
- Substantially reduced costs over what the Postal Service pays today and would expect to spend for the air transportation of mail on its current networks;
- Consistent, reliable service;
- Decrease in the Postal Service's reliance on dedicated air transportation (which

---

**2.** Express mail is overnight to most cities, with two-day guaranteed delivery; Priority is two-to-three day delivery to most cities with no guaran-

tee; and First class is intended to be delivered within two to four days to almost every city.

can result in inefficient use of capacity and increased costs) and a move toward shared lift networks that result in significant economies of scope and decreased costs;

- Use of aircraft that will mitigate the expected sharp increases in maintenance costs that the Postal Service's current dedicated networks are expected to incur;

- Full geographical reach over the domestic area now covered by the Postal Service (and greater reach, if possible);

- Strong financial stability in the contractor, which will not be overly dependent on the Postal Service for its total livelihood;

- Information technology (IT) infrastructure to support operational and customer track and trace requirements; and

- Lack of circumstances that would make the award to the contractor not in the best interests of the Postal Service or the American public.

Justification at 1.

The first part of the Justification is a detailed discussion of each of the above requirements, supplemented by specific data. The Justification emphasizes the USPS's strong preference for a contractor that could provide a shared-lift network. The second part of the Justification discusses the "Purchasing Approach" that the USPS would use to fulfill these requirements. The Justification notes that the USPS could proceed with open bidding, could pre-qualify a number of bidders and then negotiate a final contract, or could undertake a non-competitive award. After discussing each of these approaches

and evaluating what potential offerors and a bidding process would provide, the Justification concludes that "there is no source other than [intervenor] that can meet the actual requirements of [the USPS] for this procurement." Justification at 12.

The Justification also includes a lengthy appendix titled "Air Transportation Market Assessment" (the "PwC Analysis"). PricewaterhouseCoopers, LLP ("PwC"), with the assistance of MergeGlobal, Inc., developed the PwC Analysis under the direction of PwC partner William M. Takis, who testified concerning the PwC Analysis and submitted a declaration further explaining its methodology. It purports to present a "fact-based analysis of many of the carriers with whom the [USPS] could contract for air transportation services." PwC Analysis at 1. The data in the PwC Analysis were "obtained from a number of publicly available sources,[3] which are believed to be accurate and reliable." Id.

The PwC Analysis was based on seven "filters" which were used to screen out potential suppliers if they did not meet a particular requirement of the USPS. The filters themselves closely mirror the nine requirements identified in the Justification.

The first filter was labeled "Multi-carrier vs. Single Provider." A multiple-carrier solution involved the USPS's contracting out its air transportation services to several small carriers that could combine to cover the USPS's entire network.[4] A Single Provider solution signified that the USPS would contract with one large carrier. The first filter was designed to remove from consideration those carriers that did not have a large national network already in place.[5] PwC Anal-

---

3. These included SEC filings, Dow Jones Interactive, websites, JP Fleets Database, the *Official Airline Guide*, and *Aviation Week Magazine*. Mr. Takis spoke telephonically with customer service representatives of several carriers about the compatibility of containers with USPS requirements. Although plaintiff was not among them, Mr. Takis was able to obtain this information from plaintiff's website.

4. The USPS's current system of air transportation is best described as a multiple-carrier system. It combines four different contracts served by a number of transportation providers, including plaintiff and its subcontractors, Kitty Hawk

Air Cargo, and five different smaller carriers. *See* Justification at 1 n. 2.

5. According to the PwC Analysis, the major drawback of the multiple-carrier solution was the complexity and coordination difficulties that resulted in high administrative costs and decentralized contracting, purchasing, logistics, and operations. The PwC Analysis also noted the increased unreliability and potential for delays under a multiple-carrier network. Mr. Vogel testified specifically on the USPS's current multiple-carrier network and its attendant delays:

[I]f each one of those [multiple carriers] is held to a 98 percent on-time performance, 98 per-

ysis at 5, 8. The second filter, "Network Scope (National Reach)" focused on the expansion required to achieve the USPS's current scope. It was at this point that plaintiff and two other carriers were eliminated, leaving only Airborne Express, United Parcel Service, and intervenor. After the sixth filter, "Fleet Mix, Product Compatibility," only intervenor remained. Thus, the PwC Analysis concluded that using intervenor as the sole air transportation source in a shared network was a "clear advantage relative to other options under consideration." PwC Analysis at 11. Mr. Takis testified that "by the end of August time frame," the team working on the PwC Analysis had reached the conclusion that plaintiff was eliminated after the second filter and that intervenor was the only supplier remaining after the sixth filter. Transcript of Proceedings, *Emery Worldwide Airlines, Inc. v. United States*, No. 01–13C, at 258 (Fed.Cl. Jan.8, 2001) ("Hearing Tr."). Mr. Takis also stated that this conclusion has not changed since the end of August. *Id.* "[I]n late September or early October" Mr. Strange determined that a sole-source award was appropriate. Hearing Tr. at 181. The PwC Analysis is dated January 7, 2001, which is also the date on which he signed the Justification. According to Mr. Strange, negotiations with intervenor and the USPS's assessment of cost considerations consumed the time between his determination that a sole-source award was appropriate and completion of the two documents embodying the determination.

The parties also presented evidence related to whether the USPS had followed applicable regulations in making the sole-source award to intervenor. The USPS's contracting regulations are contained in Issue 1 of the United States Postal Service Purchasing Manual (Jan. 31, 1997) (the "Purchasing Manual").[6] The Purchasing Manual sets forth the USPS's procedures for procuring goods and services on competitive and noncompetitive bases. Purchasing Manual § 1.7.1.a states that "Purchases valued at more than $10,000 ... must be made on the basis of adequate competition whenever appropriate." Furthermore, "[n]oncompetitive purchases may be made only when obtaining adequate competition for the purchase is not feasible or appropriate ...." Purchasing Manual § 3.5.5.b. "All requests for noncompetitive purchases must be justified by the requesting organization, and reviewed and approved by a contracting officer delegated such authority." *Id.* at § 3.5.5.d.1. Purchasing Manual § 3.5.5.d.2 provides grounds which are used to justify a non-competitive award. At the January 8 hearing, Mr. Strange testified that, based on his assessment of the USPS's requirements, the market research that supported an award to intervenor, and the impracticability of resorting to the traditional government mode of solicitations and negotiations with multiple carriers, competition was not "feasible or appropriate." *See* Hearing Tr. at 172–73.

On January 8, 2001, JP Morgan Securities, Inc. ("JP Morgan"), presented to the USPS's Board of Governors its report and finding based, *inter alia*, on the PwC Analysis, that "the Transportation Agreement is fair and achieves the USPS objectives." The report also confirmed that, over the seven-year contract period, PwC's Base Case Forecast showed projected savings of $1.358 billion over the costs projected on the present dedicated systems.

The court entered an order denying plaintiff's application for a temporary restraining order on January 9, 2001. The court also formalized its earlier ruling that plaintiff was an interested party and had standing to

---

cent of 98 times 98 percent, the best mathematical performance you will ever get is 96 percent. It is just a mathematical fact.

The problem is also then you compound that with each one of them ... us[ing] the other person as an excuse to why their performance isn't where it is supposed to be. So you get a catapulting effect of excuses.

Bottom line, the current network is averaging about an 86 percent on-time performance .... 86 percent just is not effective to me.

Transcript of Proceedings, *Emery Worldwide Airlines, Inc. v. United States*, No. 01–13C, at 224 (Fed.Cl. Jan.8, 2001) ("Hearing Tr.").

6. The USPS is authorized to issue these contracting regulations under 39 U.S.C. § 401 and 39 C.F.R. Part 601 and § 226.2(c)(1) (1999). *See Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202–03 (Fed.Cir.1992).

bring its protest. The contract was awarded to intervenor on January 10, 2001, and the USPS and intervenor subsequently entered into two contracts, the Transportation Agreement and the Retail Agreement, both of which were signed on January 10, 2001. According to a press release issued by the USPS on the same date, under the contract the USPS "will pay FedEx approximately $6.3 billion over seven years for shared access to the FedEx national air transportation network." The arrangement is based on two separate contracts, one for air transportation and one for retail business. The press release stated that pursuant to these agreements, "the Postal Service will buy space on FedEx airplanes to transport Express Mail, Priority Mail and First–Class Mail and FedEx will locate overnight service collection boxes at post offices nationwide."

Plaintiff's first amended complaint filed on January 16, 2001, alleges broadly that the "USPS acted contrary to law, arbitrarily, capriciously, unreasonably, inconsistently with the record evidence, contrary to regulation, and in violation of the Administrative Procedure Act." First Amended Complaint for Injunctive and Declaratory Relief filed Jan. 16, 2001, ¶ 42. Plaintiff also alleges the following defects in the procurement process: (1) the USPS failed to "make a fair and equitable distribution of mail business to carriers providing similar modes of transportation services" in violation of 39 U.S.C. § 101(f); (2) the USPS failed to give the statutory notice required by 39 U.S.C. § 5005(b)(3);[7] (3) the USPS improperly failed to seek competition in violation of Purchasing Manual § 1.7.1.a, which requires "adequate competition whenever appropriate;" (4) the USPS failed to treat all potential suppliers fairly and equally by its actions during negotiations with intervenor; (5) the USPS failed to give notice of the proposed sole-source award required by Purchasing Manual §§ 3.5.3.a.3 and 3.5.5.e.2;[8] (6) the USPS's determination of its air transporta-

tion requirements was irrational and improperly restricted competition; (7) the USPS failed to comply with its own sole-source Justification in making the contract award; (8) the USPS failed to perform a proper or rational market assessment; (9) the USPS performed an insufficient or irrational analysis of intervenor's price for a shared-lift system; and (10) upon information and belief, that the arrangement between the USPS and intervenor is anti-competitive and a restraint of trade.[9] Plaintiff asks the court to set aside the award to intervenor, enjoin performance under the contract, and order that the solicitation proceed on a competitive basis.

### 3. Discovery

Defendant repeatedly refers to the discovery in this case as more extensive than ordinarily allowed in injunction cases. See, e.g., Def.'s Br. filed Feb. 23, 2001, at 5 ("overly broad"); Def.'s Br. filed Mar. 8, 2001, at 2 ("unusually broad"). Defendant does not offer the counterpoise of what discovery should entail in the normal course, although both defendant and intervenor cite Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed.Cir.2001). Impresa ruled that, "even if the agency is not obligated to provide reasons [for its decisions], a court may nonetheless order the agency to provide explanation if such an explanation is required for meaningful judicial review." Id. at 1338. The court, however, admonished that because "the agency decision is entitled to a presumption of regularity ... the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious." Id.

The record evidence in Impresa suggesting that the agency decision was arbitrary and capricious came from another proceeding. An Italian court had determined that a company officer of the successful bidder had

---

7. The claim based on 39 U.S.C. § 5005 was not pleaded in plaintiff's original complaint.

8. The claims based on these two USPS regulations also were not pleaded in the original complaint.

9. Intervenor moved to dismiss this count of the amended complaint on January 18, 2001, as beyond the jurisdiction of the Court of Federal Claims. The court, by order dated January 23, 2001, granted intervenor's motion.

engaged in bid rigging, was involved in a Mafia organization, and had intimidated another competitor into withdrawing its bid for another contract. Despite this evidence, the contracting officer found that the successful bidder was "responsible" and had "a satisfactory record of integrity and business ethics." *Id.* at 1329. The Federal Circuit deemed this evidence sufficient to allow discovery, including the deposition of the contracting officer "to plac[e] on the record the basis for the contracting officer's responsibility determination . . . ." *Id.* at 1339.

■ The court must tailor discovery in bid protest cases as narrowly as the context of the procurement allows to fill gaps in the record and explain actions taken. *See generally GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779–80 (1997). The USPS's procurement decision on review in the instant case is the Justification, which itself draws on the PwC Analysis, which was verified, to the extent of sensitivity tests, by the JP Morgan review. JP Morgan also confirmed PwC's financial projections. Plaintiff was allowed discovery to explore the relationships among these documents, which were detailed, complex, and interrelated. The steps that the USPS took to justify a sole-source award and the methodology of the PwC Analysis, upon which the Justification relied, were not self-explanatory. Moreover, defendant offered three witnesses at the January 8, 2001 hearing to establish that the USPS award was lawful and rational. As a consequence, plaintiff was entitled to depose these witnesses and examine the documents upon which they relied.[10]

## DISCUSSION

### I. *Jurisdiction*

#### 1. *Jurisdiction under the 1996 Amendments to the Tucker Act*

■ When a federal court reviews a complaint on the ground of lack of subject matter

jurisdiction, "its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint will not be dismissed on this ground "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). The burden of proving that the Court of Federal Claims has subject matter jurisdiction rests on the party seeking to invoke its jurisdiction. *See Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998).

The Court of Federal Claims is authorized "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In 1996 Congress enacted the Administrative Disputes Resolution Act of 1996, Pub.L. No. 104–320 § 12,110 Stat. 3870, 3874–75 (1996) (the "ADRA"), which expanded the court's bid-protest jurisdiction to hear both pre- and post-award protests under the Tucker Act. *See* 28 U.S.C. § 1491(b)(1). The ADRA also gave the court broad power to provide equitable relief in successful bid protests: "To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

As a jurisdictional matter, this court must address whether the USPS is a "Federal agency" within the meaning of the Tucker Act.

Title 28 provides a definition for the term "agency," but not for "Federal agency:"

As used in this title: . . . The term "agency" includes any department, independent

---

**10.** Offering witnesses at an emergency injunction hearing is appropriate, given the time constraints. However, to the extent that the witnesses justify an agency action, their testimony is subject to discovery because it constitutes post-decision explanation. *See GraphicData,* 37 Fed.

Cl. at 779 (discussing exceptions to rule that review limited to record review, including when agency action not adequately explained in the record and case so complex that court needs more evidence to understand issues clearly).

establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

28 U.S.C. § 451. The United States Court of Claims, which issued precedent binding on the Court of Federal Claims, held in *Butz Engineering Corp. v. United States,* 204 Ct. Cl. 561, 577, 499 F.2d 619, 624 (1974), that the USPS is an "agency" within the contemplation of section 451 and therefore subject to the pre-ADRA Tucker Act. In *Hewlett–Packard Co. v. United.States,* 41 Fed.Cl. 99 (1998), the court concluded that the definition of "agency" in 28 U.S.C. § 451 could be used to define the ADRA term "Federal agency," stating, "[I]t is difficult to conclude that Congress intended to substantively modify the term 'agency' with the word 'Federal.'" 41 Fed.Cl. at 103. Based on this reasoning, the *Hewlett–Packard* court also determined that the USPS was subject to the ADRA. *Id.* at 106.

In *Novell, Inc. v. United States,* 46 Fed.Cl. 601 (2000), this court ruled that the Administrative Office of the United States Courts (the "AOUSC") was not subject to the ADRA amendments. Departing from the reasoning of *Hewlett–Packard,* the court made a number of conclusions:

> Congress did not define the term "Federal agency" for purposes of 28 U.S.C.A. § 1491(b); Congress has defined the term in the procurement context to include the AOUSC; the definition in 28 U.S.C. § 451 [which is the statute defining "agency" as used in Title 28] in comparison does not reach the judiciary; and plaintiffs have not established that the AOUSC is an agency or one of the listed entities [in the Title 28 definition].

46 Fed.Cl. at 614. Thus, this court concluded that plaintiffs had failed to meet their burden to establish jurisdiction and dismissed the complaint.

Its analysis notwithstanding, the holding of *Novell* has no bearing on whether the USPS is subject to the ADRA. In that case applying the different definitions of "Federal agency" and "agency" to the AOUSC led to different results as to whether the AOUSC was subject to the ADRA. In this case the results would not differ. If the *Hewlett–Packard* approach were followed and the "agency" definition in 28 U.S.C. § 451 were applied, then "Federal agency" would include an "independent establishment ... of the United States ... unless the context shows that such term was intended to be used in a more limited sense." The USPS is an independent establishment of the executive branch of the Government of the United States, *see* 39 U.S.C. § 201, and so would be subject to the ADRA. Alternatively, if the court were to import one of the procurement definitions of "Federal agency" discussed in *Novell,*[11] then "Federal agency" would include "any executive agency or any establishment in the legislative or judicial branch of the Government (except the Senate, the House of Representatives, and the Architect of the Capitol and any activities under his direction)." 40 U.S.C. § 472(b). "Executive agency," in turn, "means any executive department or independent establishment in the executive branch of the Government, including any wholly owned Government corporation." 40 U.S.C. § 472(a). As the USPS is an independent establishment of the executive branch of the Government of the United States, 39 U.S.C. § 201, it would be subject to the ADRA. Thus, under either the Title 28 definition of "agency" or the procurement statute definitions of "Federal agency," the USPS, as an independent establishment of the executive branch, would come within the reach of the ADRA.

### 2. Jurisdiction under the APA

In arguing that "there are sound reasons ... to conclude that the Court lacks subject matter jurisdiction to hear this case," Def.'s Br. filed Feb. 23, 2001, at 3 n. 2, defendant makes a two-step argument. First, defendant relies on the legislative history of the

---

**11.** At least three procurement statutes used this definition of "Federal agency." *See* 46 Fed.Cl. at 612.

1996 amendments to the Tucker Act to demonstrate that Congress "intended to expand this Court's bid protest jurisdiction only to be coextensive with the district courts' review pursuant to *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970)." Def.'s Br. filed Feb. 23, 2001, at 3 n. 2. Next, defendant asserts that district courts did not possess jurisdiction over the USPS, because 39 U.S.C. § 410(a) exempts the USPS from the Administrative Procedure Act, 5 U.S.C.A. § 551 and scattered sections of Title 5 (1996 & Supp.2000). Defendant cites *Concept Automation, Inc. v. USPS*, 887 F.Supp. 6 (D.D.C.1995), for this proposition. From this analysis defendant reasons that, because the Court of Federal Claims only has jurisdiction coextensive with that of district courts and because the district court in *Concept Automation* concluded that it did not have jurisdiction over the USPS, the ineluctable conclusion is that the Court of Federal Claims lacks jurisdiction over this action.

Although the first step in defendant's analysis is correct, *see Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229, 236 (1983) (discussing legislative history of the Federal Courts Improvement Act of 1982, which stated that the *Scanwell* doctrine remained "intact"), the second is flawed. *Concept Automation* has been described as "contrary to the weight of authority," *Carter Chevrolet Agency, Inc. v. USPS*, 19 F.Supp.2d 1246 (W.D.Okla.1997), and other federal courts, as well as the Court of Federal Claims, have asserted jurisdiction over the USPS in the bid protest context. *See Hewlett–Packard*, 41 Fed.Cl. at 105 (citing cases); *see also T & S Prods., Inc. v. United States*, 48 Fed.Cl. 100 (2000); *Express One Int'l Inc. v. USPS*, 814 F.Supp. 93 (D.D.C.1992). Sev-

eral courts explicitly have held that "jurisdiction of a district court may be invoked to test the validity of a procurement decision made by the Postal Service pursuant to its regulations." *Peoples Gas, Light & Coke Co. v. USPS*, 658 F.2d 1182, 1192 (7th Cir.1981); *see also Hewlett–Packard*, 41 Fed.Cl. at 106, *Butz Eng'g*, 204 Ct.Cl. at 577, 499 F.2d at 624.[12] Although most of these cases, including *Concept Automation*, were decided prior to enactment of the ADRA, the weight of persuasive authority supports a holding that the ADRA confers jurisdiction over the USPS.[13]

### 3. Standards for reviewing bid protests

■ The court evaluates the procuring agency's decision to determine whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). The Federal Circuit recently addressed the APA review standards for bid protests in *Impresa*, 238 F.3d at 1332–33:

> [A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. *See Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973); *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*, 87 F.3d 1356, 1361 (D.C.Cir.1996); *Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Auth.*, 977 F.2d 1472, 1478 (D.C.Cir.1992); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). When a challenge is brought on the first

---

12. In *Hewlett–Packard* Judge Tidwell marshaled substantial case law that disagreed with defendant's preferred case, *Concept Automation*. During the January 8, 2001 hearing on plaintiff's application for a temporary restraining order, the court asked defendant to distinguish all the cases that Judge Tidwell relied on in *Hewlett–Packard*. Instead, defendant did not pursue the issue, reserving its argument for another court.

13. Defendant has an anomalous jurisdictional argument: It concedes plenary jurisdiction over the USPS in a contract action brought under 28 U.S.C. § 1491(a)(1), but, for purposes of injunc-

tive review of the same contract, defendant would deny jurisdiction under section 1491(b)(1). The two provisions are worded differently: The former predicates jurisdiction on a "contract;" the latter, on the definition of a "Federal agency." However, it would be remarkable for defendant to take the position that the USPS could be sued under section 1491(a)(1) in a garden-variety contract action, but that, if an action were brought against the USPS under section 1491(b)(1) as a suit for injunctive relief, jurisdiction would be lacking.

ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.,* and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994) [citation omitted]. When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron,* 480 F.2d at 1169; *Latecoere,* 19 F.3d at 1356.

■ A protestor must prove, by a preponderance of the evidence, the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement statute or regulation. *See CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999); *R.R. Donnelley & Sons. Co. v. United States,* 38 Fed.Cl. 518, 521–22 (1997); *PCI/RCI v. United States,* 36 Fed.Cl. 761, 767 (1996).[14] The injunctive relief sought by a frustrated offeror is appropriate "only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983).

Because this case involves a USPS purchasing contract, the "applicable regulations" are contained in the Purchasing Manual. The USPS is authorized to issue these regulations under 39 U.S.C. § 401 and 39 C.F.R. Part 601 and § 226.2(c)(1) (1999). *See Modern Sys. Tech. Corp. v. United States,* 979 F.2d 200, 202–03 (Fed.Cir.1992); *T & S Prods.,* 48 Fed.Cl. at 104.

### 4. *Review of the administrative record*

This case has been heard on cross-motions for summary judgment based on the administrative record. RCFC 56.1 provides that such a motion will be briefed as a motion for summary judgment under Rule 56, with the parties submitting statements of proposed undisputed facts. This is a rule of convenience; it facilitates presentation of the parties' cases, but is not a standard for determining whether disputed facts preclude deciding the case without trial. Of course, record review is fraught with disputed renditions of the facts. The question in bid protest cases is whether a plaintiff can demonstrate that the agency contravened an applicable procurement statute or regulation, or acted irrationally based on what the agency can substantiate without dispute that the decision-maker(s) did or relied upon in making the award.

Plaintiff's position is that while the record would support a judgment in its favor, disputed issues of material fact preclude entry of judgment for defendant and intervenor. Cases will arise, and have been tried, where the record does not enable a court to determine the basis for the agency action without proceeding to trial. This is not such a case.

### II. *Violation of applicable procurement statutes and regulations*

#### 1. *Use of a sole-source award*

■ As an initial matter, plaintiff objects to a sole-source award. Assuming that the USPS can make a noncompetitive award, plaintiff then contends that the sole-source award was made improperly to intervenor. Plaintiff encapsulates its argument that the

14. Plaintiff argues that this case is governed by the standards articulated in *Aero Corp. v. Dep't of the Navy,* 540 F.Supp. 180, 207–08 (D.D.C.1982) ("*Aero I*"). The district court endorsed a line of cases interpreting 10 U.S.C. § 2304(g)(3), which commands an agency to "promote competition to the maximum extent practicable." These cases stand for the proposition that the superiority or experience of one contractor over another cannot justify a sole-source procurement. How-

ever, this statute does not apply to the USPS. In contrast, the USPS is permitted to make a noncompetitive award upon determining that competition is "not feasible or appropriate." Purchasing Manual § 3.5.5.b; *see also* 39 U.S.C. § 5402(d) ("The [USPS] may ... contract ... either through negotiations or competitive bidding."). *Aero I* and the cases cited therein thus are not relevant to the instant action.

sole-source award violates an applicable procurement statute, as follows: "The anti-competitive, anti-distributive, industry-shrinking award to FedEx, as well as the secretive and obstructionist manner in which USPS conducted this sole-source procurement violate [39 U.S.C. § 101(f) ] . . . ." Pl.'s Br. filed Mar. 8, 2001, at 5–6. Plaintiff argues that USPS is statutorily prohibited from making a sole-source award of the type contemplated in the instant case based on 39 U.S.C. § 101(f), which provides:

In selecting modes of transportation, the Postal Service shall give highest consideration to the prompt and economical delivery of all mail and shall make a fair and equitable distribution of mail business to carriers providing similar modes of transportation services to the Postal Service.

The USPS listed "a single integrated, national air transportation network, operated by a single, national contractor" and a "[d]ecrease[d] reliance on dedicated air transportation . . . and a move toward shared lift networks" as two requirements to support its sole-source justification. *See* Justification at 1. The record leaves little doubt that the USPS intends to distribute a significant portion of its future air transportation business to a single national carrier, to the exclusion of other potential providers. Plaintiff insists that section 101(f) prohibits such a distribution. In the alternative, plaintiff claims that the "fair and equitable distribution" language of section 101(f) makes competition a requirement for the air transportation service contemplated by this contract.

Plaintiff's argument that section 101(f) prohibits an award to a single contractor fails for several reasons. If such an award is prohibited by the "fair and equitable" requirement of section 101(f), as plaintiff postulates, then any sole-source award, or any contract that does not distribute mail in an "equitable" manner, could be set aside. In other words, plaintiff would define "fair and equitable distribution" as either "equal distribution" or "distribution based on competition." The USPS is not bound to such an interpretation, but need only make a "fair and equitable distribution of mail business to carriers providing similar modes of transpor-

tation services." This mandate certainly contemplates a situation in which the only "fair and equitable distribution" is an award to a single provider. If, based on a reasoned and sound approach, the USPS concludes that the only appropriate distribution is to a single provider, then section 101(f) does not bar making such a distribution. The provisions of the Purchasing Manual that recognize and allow the use of sole-source awards, as the cognizant agency's interpretation of the statute, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), support such an interpretation.

Plaintiff is really arguing that section 101(f) requires a competitive award of this contract. 39 U.S.C. § 5402(d) establishes that "The [USPS] may . . . contract . . . either through negotiations or competitive bidding." The Purchasing Manual also contemplates sole-source awards. The discretion to determine an appropriate means for procurement thus lies with the USPS, and therefore the "fair and equitable distribution" called for by section 101(f) cannot be construed to demand competitive award of all contracts.

### 2. *Public notice*

Plaintiff contends that the USPS violated an applicable procurement statute and regulations relating to publication of the sole-source award and contract. According to plaintiff, the USPS failed to make the sole-source contract available for inspection as required by 39 U.S.C. § 5005(b)(3) and independently violated two provisions of the Purchasing Manual related specifically to publicizing non-competitive awards.

### 1) *39 U.S.C. § 5005(b)(3)*

39 U.S.C. § 5005(b)(3) provides, in full:

Any contract between the Postal Service and any carrier or person for the transportation of mail shall be available for inspection in the office of the Postal Service and either the Surface Transportation Board or the Secretary of Transportation if for the carriage of mail in foreign air transportation (as defined in section 40102(a) of Title 49), as appropriate, and in post offices on the post roads involved, as determined by

the Postal Service, at least 15 days prior to the effective date of the contract.

The contract at issue is one between the USPS and intervenor for the transportation of mail. The parties do not dispute that the instant contract was signed on January 10, 2001, and that it was not available for inspection before that date. At present the contract is not available for public inspection.

Plaintiff argues that the USPS's failure to publicize the contract violated the clear language of section 5005(b)(3). The plain language of the statute is the touchstone. *See Fanning, Phillips, Molnar v. West,* 160 F.3d 717, 721 (Fed.Cir.1998). The contract must have been made available for inspection 15 days before January 10, 2001, in the following three places: 1) the office of the USPS; 2) either the Surface Transportation Board or the Secretary of Transportation if for the carriage of mail in foreign air transportation; and 3) post offices on post roads involved. Examining these categories of locales in reverse order, the third category is inapplicable,[15] leaving only the first two categories. Category two might be construed in one of two ways: A contract might be required to be made available for inspection at the Surface Transportation Board if it were a non-foreign air transportation contract and at the office of the Secretary of Transportation if it were a foreign air transportation contract. Alternatively, category two might require the contract to be made available at either the Surface Transportation Board or at the office of the Secretary of Transportation, but only if the contract was a foreign air transportation contract.

■■■■ The correct interpretation of category two need not be decided, however, because under a plain-language reading of category one, any contract, including the one at issue, must be made available in the office of the USPS. *Chevron* instructs: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S.

at 842–43, 104 S.Ct. 2778 (footnote omitted). On the other hand, if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnote omitted); *see also Northrop Grumman Corp. v. United States,* 47 Fed.Cl. 20, 37 (2000).

■■■■ A statute is ambiguous when the plain language leads to absurd consequences or to results not in concert with Congress's policy. *See Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 508–11, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); *Neptune Mut. Assn., Ltd. of Bermuda v. United States,* 862 F.2d 1546, 1549 (Fed.Cir.1988) (citing cases). Justice Kennedy described this rule of construction, sometimes called "the Golden Rule" (quoted in *AT & T v. United States,* 177 F.3d 1368, 1383 (Fed.Cir.1999) (J. Plager, dissenting)), thusly:

> Where the plain language of the statute would lead to "patently absurd consequences," that "Congress could not possibly have intended," we need not apply the language in such a fashion .... This exception remains a legitimate tool of the Judiciary, however, only as long as the Court acts with self-discipline by limiting the exception to situations where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.,* where it is quite impossible that Congress could have intended the result, and where the alleged absurdity is so clear as to be obvious to most anyone.

*Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 470, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring) (citations omitted). Where a literal interpretation contravenes the purpose of the statutory scheme or leads to an absurd result, the court can look beyond the express language of the statute. *See Brooks v. Donovan,* 699 F.2d 1010, 1011 (9th Cir.1983); *Nike, Inc. v. Wal–Mart Stores, Inc.,* 138 F.3d 1437, 1440 (Fed.Cir.1998).

---

**15.** The Postal Reorganization Act defines "post roads" in the context of air transportation contracts as "air routes in operation." 39 U.S.C. § 5003(2). As there are no post offices on air routes, air transportation contracts need not be made available for inspection under the category "post offices on post roads involved."

Defendant, relying on the legislative history of section 5005(b)(3), advances an argument that disregards the plain language result in favor of the USPS's unique interpretation. Thus, the court tests the plain meaning of section 5005(b)(3), pressed by plaintiff, to establish whether it was "impossible that Congress could have intended the result" and whether "the alleged absurdity is so clear as to be obvious to most anyone." *Public Citizen,* 491 U.S. at 470, 109 S.Ct. 2558.

In 1970 section 5005(b)(3) was originally enacted, as follows:

Any contract between the Postal Service and any carrier or person for the transportation of mail shall be available for inspection in the office of the Postal Service and either the Interstate Commerce Commission or the Civil Aeronautics Board, as appropriate, and in post offices on the post roads involved, as determined by the Postal Service, at least 15 days prior to the effective date of the contract.

Pub.L. No. 91–375, § 5005(b)(3), 84 Stat. 719 (1970). In 1970 the Civil Aeronautics Board (the "CAB") was responsible for route-making and rate-setting for domestic and foreign airlines operating in the United States.

In 1984 the CAB Sunset Act, Pub.L. No. 98–443, 98 Stat. 1703 (1984), authorized the USPS to use competitive bidding or negotiations in place of CAB rate-setting for interstate or overseas mail transportation. *See* Pub.L. No. 95–504, § 1601(b)(1)(D), 92 Stat. 1705; Pub.L. No. 98–443, § 9(g)(4)(F), 98 Stat. 1707; *see also* 39 U.S.C. § 5402(d). The CAB Sunset Act simultaneously amended section 5005(b)(3) "by striking out 'Civil Aeronautics Board' and inserting in lieu thereof 'Secretary of Transportation if for the carriage of mail in foreign air transportation (as defined in section 101 of the Federal Aviation Act of 1958).'" Pub.L. No. 98–443, § 9(g)(2), 98 Stat. 1707. Section 5005(b)(3) subsequently was amended to change "Interstate Commerce Commission" to "Surface Transportation Board" and to update the statutory reference for the definition of "foreign air transportation" in 49 U.S.C. § 40102(a). These changes resulted in the statutory language that persists today,

which, as defendant aptly concedes, "is not a model of clarity." Def.'s Br. filed Feb. 23, 2001, at 24.

This legislative history is the predicate for defendant's argument against the plain meaning of section 5005(b)(3). The original purpose behind publication, defendant argues, existed only when the CAB had rate-setting responsibility. When the CAB did have such jurisdiction, the publication required by section 5005(b)(3) was intended to ensure uniformity of terms. However, after the CAB no longer had rate-setting jurisdiction and the USPS moved to competitive bidding and negotiations, publication no longer served any meaningful purpose. In an attempt to give some meaning to the statutory language, defendant maintains that the USPS itself has interpreted section 5005(b)(3) reasonably to require the posting of air transportation contracts only "if [they are] for ... foreign air transportation."

For its part, plaintiff does not take the position that the USPS has publicized contracts that have been competitively awarded. Indeed, plaintiff acknowledges that its own contracts have not been published pursuant to section 5005(b)(3). That plaintiff would now argue against past practices after having enjoyed the benefits of non-publication for the past 15 years undermines its argument. Plaintiff's explanation that its contracts were not posted because they were competitively bid is unconvincing in that plaintiff asks this court to construe section 5005(b)(3) strictly to require the posting of "any contract." Plaintiff holds to a strict plain-meaning interpretation and must acknowledge that its own past practice with the USPS did not conform to this interpretation. Thus, the court is presented with legislative history supporting an interpretation of section 5005(b)(3) that required posting only when the CAB had ratemaking authority and an agency practice (enjoyed by plaintiff) implementing this interpretation.

Intervenor, joined by defendant during oral argument, points to another provision of the Postal Reorganization Act that limits disclosure of trade secrets or commercial information "which under good business practice would not be publicly disclosed." 39 U.S.C.

§ 410(c)(2). Because it has been the USPS's business practice not to disclose the terms of competitively awarded contracts, the plain meaning of section 5005(b)(3), in intervenor's view, conflicts with section 410(c)(2). Intervenor and defendant urge the court to refrain from interpreting section 5005(b)(3) in such a way that would require one statute to be read in conflict with another. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).[16]

The legislative history of section 5005(b)(3) provides sufficient grounds to support a construction that requiring posting of all USPS contracts for air transportation would lead to an absurd result. Sound reasons persuade the court to look beyond the plain meaning of section 5005(b)(3). Although when it was first enacted, section 5005(b)(3) served the purpose of ensuring uniformity of postal rates, that purpose is no longer advanced in a competitive bidding or negotiated procurement regime. "[I]t is quite impossible that Congress could have intended the result," *Public Citizen*, 491 U.S. at 470, 109 S.Ct. 2558, that the USPS engage in competitive bidding and/or negotiated procurements under the Postal Reorganization Act, while at the same time publishing all of its contracts and their confidential terms in violation of section 410(c)(2) of the same act. "[T]he alleged absurdity is so clear as to be obvious to most anyone." *Public Citizen*, 491 U.S. at 470, 109 S.Ct. 2558.

Plaintiff relies on *Northern Colorado Water Conservancy Dist. v. FERC*, 730 F.2d 1509 (D.C.Cir.1984) ("*NCWCD*"), for the proposition that legislative history cannot override a mandate to publish a notice. The setting of that case differs significantly in that the court in *NCWCD* was not persuaded that the legislative history was of sufficient clarity to override the clear statutory command. 730 F.2d at 1518. Here, the court concluded that the legislative history detail-

ing the transmutation of section 5005(b)(3) does support defendant's interpretation. Moreover, the *NCWCD* court specifically found that, if the agency had interpreted the statute at issue as not requiring publication, it had to provide general notice of this interpretation. 730 F.2d at 1521. That it did not do so was fatal to the agency's interpretation. In the instant case, no interested competitor, least of all plaintiff, can complain that it was unaware that the USPS had interpreted section 5005(b)(3) as not requiring publication.

Plaintiff asserts that publication is required notwithstanding the current lack of purpose. However, the USPS's interpretation of section 5005(b)(3), *i.e.*, that only foreign air transportation contracts are subject to a publication requirement, is not unreasonable. The USPS's non-publication of the contract with intervenor was not a violation of section 5005(b)(3). Plaintiff's protest on this ground is denied.

### 2) *Purchasing Manual §§ 3.5.3.a.3 and 3.5.5.e.2*

Plaintiff also charges that the USPS violated two provisions of the Purchasing Manual related to publication of contract awards and purchases. The Purchasing Manual sets forth the applicable procurement regulations. The relevant portions of the Purchasing Manual with their original headings and format intact, are reproduced, as follows:

**3.5.3 Publicizing Purchasing Opportunities**

3.5.3.a *Policy*

1. All purchase opportunities valued at over $100,000 ... must be publicized
 ....

2. To promote competition in subcontracting, the Postal Service publicizes contract awards, competitive or noncompetitive, having significant subcontracting opportunities....

---

16. Defendant and intervenor also assert that a publication requirement would conflict with other statutes prohibiting disclosure of such information.

Intervenor points to provisions of the Trade Secrets Act, 18 U.S.C. § 1905, and the Freedom of Information Act, 5 U.S.C.A. § 552 (1996 & Supp.2000) ("FOIA"), as a bar to posting of

USPS contracts. Plaintiff demurs by pointing out that the Trade Secrets Act and FOIA allow disclosures "authorized by law." 18 U.S.C. § 1905. Plaintiff maintains that section 5005(b)(3) is such an authorization and that any conflict with section 5005(b)(3) is illusory. The court agrees with plaintiff.

3. Regardless of purchasing method used, noncompetitive purchases ... valued at more than $500,000 must be synopsized in the [Commerce Business Daily or "CBD"] and other media as appropriate.

. . . .

### 3.5.5 Noncompetitive Purchases

. . . .

#### 3.5.5.e *Contract Award*

. . . .

2. If the contracting officer determines that the noncompetitive contract offers significant subcontractor opportunities, he or she may publicize the award in the appropriate media. All noncompetitive contracts valued at more than $500,000 must be publicized in the CBD.

The subject contract is valued at more than $500,000. It was not published or synopsized in the CBD before the contract was awarded and signed, although the USPS represents that the contract was synopsized in the CBD during the pendency of this lawsuit. Plaintiff argues that publication of the contract (or its synopsis) after award does not satisfy the requirements of the Purchasing Manual and frustrated plaintiff's ability to challenge the sole-source award and demonstrate plaintiff's standing as a viable source. Plaintiff points to the section heading "Publishing Purchasing Opportunities" to argue that no "opportunities" could be realized by potential bidders or challengers if publication does not take place before a contract is awarded.

■■■■ Defendant incorrectly states that "[t]he [Purchasing] Manual refers to publicizing only 'purchases,' not 'purchasing opportunities.'" Def.'s Br. filed Feb. 23, 2001, at 28. Defendant uses this alleged distinction and the lack of an explicit pre-award publication requirement to argue that post-award publication still serves the purpose of the procurement regulation. However, defendant fails to acknowledge the bolded oversized title of

section 3.5.3: "Publicizing Purchasing Opportunities." The title of a statute may be used to "'she[d] light on some ambiguous word or phrase in the statute itself.'" *Whitman v. American Trucking Assocs., Inc.*, 531 U.S. 457, 121 S.Ct. 903, 917, 149 L.Ed.2d 1 (2001) (quoting *Carter v. United States*, 530 U.S. 255, 267, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)). Because section 3.5.3.a.3 is ambiguous as to the timing of the required published synopsis, the court looks to the title for guidance. The title "Publicizing Purchasing Opportunities" supports an interpretation that the procurement regulation is directed to publicizing an "opportunity" to compete for a solicitation, to compete for subcontracting opportunities, or to submit information that might be relevant to the USPS's determination to sole-source. Thus, the synopsis must be publicized before contract award.[17]

■■■■ The arrangement of the regulations under section 3.5.3 also confirms this conclusion. Section 3.5.3.a entitled "Policy" is arranged in three subsections. The first addresses publication of purchase opportunities, presumably the competitive variety. The second subsection addresses subcontractor opportunities, and the third requires synopsis in the CBD of noncompetitive purchases (valued at more than $500,000).

Defendant also presses an interpretation of section 3.5.5.e.2 that allows publication after contract award at the discretion of the USPS. As A. Keith Strange, the USPS's Vice President Purchasing and Materials, who was the approving official for the Justification, testified: .

What we would do—what I generally do on noncompetitives is we can publicize at two different points. There are times when I have a noncompetitive justification before me where we were satisfied that the market research has been sufficient.

And in those cases, I will require publicizing prior to contract award to see if perhaps there might be other suppliers who could do the work. In other cases where I am convinced that for whatever the reason cited in the noncompetitive,

---

17. Requiring publication of a pre-award synopsis would not implicate any of the confidentiality or legislative purpose concerns discussed with respect to 39 U.S.C. § 5005(b)(3).

that a noncompetitive is clearly appropriate and reasonably justified, we publicize at the point of contract award which I believe is consistent with the policy which calls for publicizing awards and not solicitations or negotiations.

Hearing Tr. at 171–72. This agency interpretation is entitled to deference if it is reasonable. A reviewing court will "give effect to the agency's interpretation [of its own regulations] so long as it is 'reasonable,' that is, so long as the interpretation 'sensibly conforms to the purpose and wording of the regulations.'" *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (quoting *Northern Indiana Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League of Am., Inc.,* 423 U.S. 12, 15, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975)). Mr. Strange's interpretation might be reasonable as applied to the first sentence of section 3.5.5.e.2 ("If the contracting officer determines that the noncompetitive contract offers significant subcontractor opportunities, he or she may publicize the award in the appropriate media."), but it ignores the rest of the regulatory text mandating publication or synopsis of all noncompetitive contracts exceeding $500,000.

Plaintiff submitted a February 9, 2000 CBD "Special Notice," which comports exactly with the straightforward reading of section 3.5.3.a.3. The USPS published the following pre-award notice of noncompetitive procurement:

TITLE: [USPS] POS RETAIL DATA MART(RDM)DATA STORAGE The Postal Service intends to award on a [SOLE SOURCE] basis to EMC Corporation a contract to provide 5.8 TB of storage in support of the [USPS] Point of Service Retail Data Mart Program (RDM). The RDM Oracle database and application are currently operating in a SUN/NT clustered environment. The EMC Symmetrix system has been selected due to its fully certified and unique capability to perform I/O workload balancing, physical volume load balancing, and Oracle database monitoring all within a SUN clustered environment. This increased storage capacity is required on March 1, 2000 to support the imminent growth of this [USPS] datamart. This notice of intent is not a request for competitive proposals. NO SOLICITATION EXISTS. A determination by the [USPS] not to open the requirement to competition based upon responses to this notice is solely within the discretion of the [USPS]. Information received as a result of this notice will normally be considered solely for the purpose of determining whether to conduct a competitive procurement. Telephone inquiries will not be honored.

With evidence that the USPS interprets the regulations consistent with its own reading, plaintiff convincingly shows that the language of the procurement was violated. The regulation omits a time requirement (allowing intervenor to argue unpersuasively that publication in the CBD on the day before award would suffice), but this omission is not fatal to plaintiff's interpretation. As plaintiff points out, when a specific time is omitted, a reasonable time consistent with the purposes of the statute can be implied. *See, e.g., Ma v. Reno,* 208 F.3d 815, 821–22 (9th Cir.2000). In any event, the court need not reach this question. The USPS did not publicize a synopsis of the contract before the award as required by section 3.5.3.a.3.[18]

---

18. Plaintiff relies on *Aero Corp v. Navy,* 493 F.Supp. 558 (D.D.C.1981) ("*Aero II*"), to assert that the USPS improperly frustrated plaintiff's opportunity to challenge the sole-source award. *Aero II* held that the Navy "breached its statutory duty to facilitate GAO and judicial review," *id.* at 568, when it twice asserted before the GAO that a final decision as to sole-source procurement had not been made, when, in fact, it had. The GAO had dismissed both protests from Aero based on these representations that a decision was not "final." The reviewing court held that this conduct breached a statutory duty that "had as its principal apparent effect frustration of Aero's opportunity to obtain considered review of the [sole-source] decision." *Id.*

*Aero II* is distinguishable because that court found specifically that the Navy's decision to sole-source was completed at the time the plaintiff in that case filed its protests. Here, although the USPS did not publish an announcement of the sole-source award in the CBD, it did not do what the Navy in *Aero II* did, *i.e.,* take the position before the GAO or a reviewing court that a sole-source decision had not been made.

Defendant's final argument is that the various news reports gave plaintiff notice of the sole-source procurement with intervenor and that plaintiff should have brought its action during fall 2000 instead of causing grave inconvenience by suing just before the date of award. In defendant's opinion the putative actual notice afforded more information than the required synopsis. The court rejects defendant's attempt to shift to plaintiff the USPS's responsibility for giving notice or to saddle plaintiff with responsibility for waiting until the eleventh hour to notify the USPS that it wanted to participate in the proposed air transportation network. Suffice it to say that the lynchpin of the sole-source procurement was the shared network. The various press stories did not relate the salient information that the USPS had determined that only a shared network would meet its needs; moreover, when plaintiff inquired in December 2000 whether the USPS preferred a dedicated or shared network, the USPS deliberately obfuscated the choice that it made in September 2000. In these circumstances defendant cannot assert laches against plaintiff.

### 3. Prejudice

In *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir. 1999), the Federal Circuit held that the showing of prejudice required by a protester that has suffered clear violation of an applicable procurement regulation is " 'a substantial chance it would have received the contract award but for that error.' " *Id.* (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)).

Plaintiff does not protest an award after bidding or submitting proposals, so no solicitation is present against which a proposal from plaintiff could be measured. Plaintiff's challenge is to the sole-source award to intervenor. Given the violation of section 3.5.3.a.3, the court must consider the showing

that plaintiff must make in order to establish prejudice. Several approaches could be undertaken.

Plaintiff could be required to show that it would have been willing and able to submit a proposal or other information if the required pre-award notice of solicitation had been issued. Any sole-source award protestor readily could meet this showing. However, prejudice is "[d]amage or detriment to one's legal rights or claims." *Black's Law Dictionary* 1198 (7th ed.1999). If, as *Alfa Laval* teaches, the "right" accorded to a bid protestor alleging a prejudicial error bears a close relationship to that protestor's "substantial chance" of receiving the contract award, plaintiff in a sole-source award protest cannot show that its legal rights or claims have been damaged merely because it was not able to submit a proposal.

An approach that comports with the showing required by *Alfa Laval* is more sound. To challenge a sole-source award on the basis of an alleged error in the procurement process, a protestor must show that it had a substantial chance of receiving the contract award. *Alfa Laval*, 175 F.3d at 1367; *accord Myers Investigative & Sec. Servs., Inc. v. United States*, 47 Fed.Cl. 605, 620 (2000) (applying standard in sole-source procurement).[19] A plaintiff could attempt to meet this burden in at least two ways. It could accept the agency's requirements which originally prompted the sole-source contract and demonstrate that it could meet those requirements and would have had a substantial chance of receiving the sole-source award. Alternatively, a plaintiff could challenge the agency's requirements as arbitrary, capricious, or irrational; assert what the correct requirements should have been; and then demonstrate that it could have met those requirements. Plaintiff attempts both showings and fails on both.

---

19. While recognizing that *Alfa Laval* is the governing standard for prejudice, plaintiff incorrectly cites *Myers Investigative & Security Services, Inc. v. United States*, 47 Fed.Cl. 605, 612–13 (2000), as a basis for asserting that an opportunity to compete is all that is required to make this showing. *See* Pl.'s Br. filed Mar. 8, 2001, at 43–

44. *Myers* addresses standing, not prejudice at pp. 612–13. Nonetheless, plaintiff implicitly acknowledges the *Alfa Laval* standard, asserting that "[plaintiff] has a substantial chance of winning the award . . . ." Pl.'s Br. filed Mar. 8, 2001, at 44.

 As discussed in section III *infra*, plaintiff could not have met the USPS's requirement of a shared network, and, on this basis alone, it is sufficient to conclude that plaintiff would not have had a substantial chance of receiving the award. Although plaintiff has shown a clear violation of an applicable procurement regulation, plaintiff was eliminated early in the process and the basis for doing so was rational. Consequently, plaintiff has not demonstrated the requisite prejudice.

## III. *The USPS's decision to award a sole-source contract to intervenor*

Plaintiff makes a number of arguments relating to the USPS's decision and decision-making process. Other than challenges based on statutes and the Purchasing Manual,[20] plaintiff's arguments are directed to establishing that the USPS's decision lacked a rational basis and do not allege a specific violation of an applicable procurement regulation. Therefore, "the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa*, 238 F.3d at 1332–33 (citations omitted).

In reviewing whether the award decision had a rational basis and whether the USPS provided a coherent and reasonable explanation, an analytical distinction can be made among plaintiff's various arguments. In one group of arguments, plaintiff alleges arbitrary and irrational conduct in the value judgments made by the USPS based on the factual analysis that was developed by PwC. In the other plaintiff attacks the PwC Analysis itself, pointing out factual inaccuracies

that, according to plaintiff, are so glaring as to make any decision based on the PwC Analysis arbitrary, capricious, and irrational on its face.

### 1. *The award to intervenor based on the PwC Analysis*

Plaintiff argues that the award based on the PwC Analysis was not rationally based. It characterizes the circumstances surrounding PwC's approach as favoring intervenor. Considered by themselves, these circumstances are deemed sufficient by plaintiff to establish that the USPS's decision to award this contract to intervenor was arbitrary and irrational.

The concept leading to the contract originated from a discussion that took place in mid-summer 2000 between the Postmaster General and intervenor's CEO about a possible alliance involving an arrangement for transportation of USPS products. A team of Mr. Vogel (Vice President Network Operations Management), Mr. Strange (Vice President Purchasing and Materials), and Mr. Young (Contracting Officer) was assigned to develop the business case for such an arrangement. In early August Mr. Young tasked PwC and its subcontractor MergeGlobal to evaluate intervenor against other potential providers in the marketplace and to participate in negotiations with intervenor.

Defendant admits that "Mr. Vogel and his staff developed the formal requirements for the contract and provided those requirements to Mr. Young and to PwC. . . ." Def.'s Statement of Facts filed Feb. 23, 2001, ¶ 8. On August 14, 2000, the USPS procurement officials themselves made a presentation titled "U.S. Postal Service Air Transportation Strategy." The presentation evolved into the sole-source award to intervenor and reflected

---

**20.** Plaintiff contends that the USPS violated Purchasing Manual § 3.5.5.d.2(a)(6) insofar as the required justification for the noncompetitive purchase did not rationally demonstrate that "competitive purchasing is not otherwise in the best interests of the Postal Service." This argument is addressed by analyzing whether the USPS rationally concluded that a sole-source award to intervenor was justified. Plaintiff contends that the USPS violated two other provisions of the Purchasing Manual (§ 1.1.1.b.2 and § 3.2.2.b.1), when it did not treat plaintiff "fairly and equal-

ly." The court finds no basis for this allegation, as plaintiff has not demonstrated that the USPS irrationally excluded it from consideration for the sole-source award. To the extent that plaintiff asserts that the USPS violated Purchasing Manual § 3.5.5.b by failing to determine or irrationally determining whether competition was "feasible or appropriate," this argument also is addressed by analyzing whether the USPS rationally concluded that a sole-source award to intervenor was justified.

the formal requirements for the contract developed by Mr. Vogel and his staff.[21] A slide titled "Purpose" listed three bullet items:

- Define USPS requirements for national time-definite air service.
- Explore the relative strengths and weaknesses of FedEx vs. other potential providers of national time-definite air services.
- Assist the Postal Service in developing the business case for a contractual relationship with FedEx that includes a national shared-lift network.

Other slides from the August 14, 2000 presentation outlined the pro's and con's of dealing with intervenor. Under pro's, the slides listed "Best overall air city coverage," "[l]argest overall aircraft fleet," and "[l]argest carrier of nightly and daylight weight lift capacity with better marginal cost in daylight," among other factors. The presentation included a number of pie graphs depicting the Air Express Traffic of various air transportation providers, including plaintiff. The presentation also made some side-by-side comparisons between intervenor and two other air transportation providers: United Parcel Service and Airborne Express.

Although the August 14, 2000 presentation stated that one purpose was to "[a]ssist the Postal Service in developing the business case for a contractual relationship with FedEx that includes a national shared-lift network," it was not until "late September or early October" that Mr. Strange determined that a sole-source award was appropriate. Hearing Tr. at 181.

The August 14, 2000 presentation contains a slide that lists a number of USPS requirements. These requirements were transferred (verbatim or in substantially the same form) to the January 7, 2000 PwC Analysis. The requirements for a potential supplier listed in the August 14, 2000, presentation were

- A national time-definite overnight air network
- A national time-definite daytime air network

- National ground handling and sortation services
- Integrated surface transportation
- The technology to meet, and to demonstrate compliance with USPS performance and tracking requirements
- The operational, administrative, and financial ability to increase the size of its existing network to handle over 3 million additional pounds of time-definite letters and packages per day
- Its own thriving and stable time-definite products to share lift with USPS products, thus reducing USPS costs and financial risks

The January 7, 2001 PwC Analysis lists the "operational parameters" of a "future transportation network" as

- A national time-definite overnight network
- A national time-definite daytime air network
- Nationwide ground handling and sortation services
- Sophisticated performance measurement and tracking technology
- The ability to handle over three million additional pounds of letters and packages per day without service interruption
- Reduce current costs and manage cost growth in future years

Mr. Takis acknowledged that the USPS communicated these "operational requirements" to him "back in early August." Hearing Tr. at 248. However, he testified that "they were communicated to me largely orally" *id.* at 249, and, incredibly, despite the fact that the USPS had drafted almost the same requirements in August 2000, Mr. Takis himself claimed original authorship of the operational requirements listed in the January 7, 2001 PwC Analysis. At the January 8, 2001 hearing, Mr. Takis stated that "the writing of these words, I was probably primarily responsible for drafting them ...." *Id.* The following exchange also occurred at the January hearing:

---

**21.** In order to preserve the integrity of the original quotations and to facilitate discussion, portions of this discussion do not substitute the term "intervenor" for "FedEx."

Q: When you were given this set of requirements and you began to set out to look at the market, did anyone from the Postal Service ever suggest to you that a particular supplier or a handful of suppliers might be the ones that would satisfy?

Takis: Absolutely not. And I would not have accepted the assignment if they had done that.

Hearing Tr. at 252. Mr. Takis so testified even though the August 14, 2000 presentation (a copy of which Mr. Takis was given and obviously was used by him to draft his own operational requirements) refers to intervenor as a supplier that the USPS favored and lists, as an objective, establishment of a business case for the relationship. Indeed, as of early September the negotiations had begun, preceded by a priced offer from intervenor, which, in turn, was preceded by a communication of USPS requirements to intervenor.

These facts demonstrate that, as of August 14, 2000, PwC was given a presentation that highlighted intervenor as a preferred supplier of a single national network. This occurred before the mid-September or early October period that Mr. Strange identified as the time frame in which he concluded that a sole-source award was appropriate. These facts also show that despite Mr. Takis's claims to the contrary, PwC was retained by the USPS simultaneously to "define USPS requirements for national time-definite air service" and "[a]ssist the Postal Service in developing the business case for a contractual relationship with FedEx that includes a national shared-lift network." Mr. Takis had access to the August 14, 2000 presentation and he used it to prepare the operational requirements in the PwC Analysis.

22. The court discerns a difference between justifying a sole-source determination, on the one hand, and defending the resultant contract, on the other. The court carefully has reviewed plaintiff's arguments that the negotiated contract actually is inconsistent with the Justification and finds them to be without merit.

23. The Justification continued:
The main advantage of [the shared-lift network] approach, depending on the provider chosen, is the potential for significantly re-

Let there be no mistake. The USPS did not engage PwC to conduct an iterative process. The USPS had a sole-source award to intervenor as an objective, and PwC's task was to justify it.[22] But, as explained below, the backdrop against which the PwC Analysis was undertaken does not render arbitrary or irrational the decision to remove plaintiff from consideration early in the decision-making process, nor does it implicate the fundamental reasonableness of the analysis as applied to plaintiff.

In its Justification the USPS emphasized the need for a shared network. An objective was "to move toward a well established shared-lift network." Justification at 2. The USPS's desired approach was "a shared-lift network with a single, national vendor that currently operates a network for its own products and already bears a significant portion of the resulting operating and overhead costs." *Id.* The USPS emphasized in the Justification its desire for a shared-lift network prominently and repeatedly.[23] The Justification stated that the single supplier chosen must meet the following operational requirements, among others: Network Scope, Scale and Track and Trace. *Id.* at 2–3. The Justification defines these terms, as follows:

**Network Scope:** The contractor must have an existing air network that is national in scope and can be readily configured to reach the cities already serviced by the existing Postal Service systems, as well as the ability to quickly and efficiently expand its service to additional cities to meet the needs of the Postal Service.

**Scale:** The contractor's network must provide sufficient airlift and aircraft to result in a cost-effective and reliable network over the foreseeable future. The contrac-

duced costs over a dedicated system arising from economies of scope. Instead of having to contract an entire plane on a particular origin-destination route for a small amount of mail that requires air service, the Postal Service will be able to "piggy-back" on a plane that already carries expedited product on that particular route. The resulting economies of scope arising from shared lift can result in significant cost savings for the Postal Service.
Justification at 2.

tor must supply enough aircraft to supply 250,000 pounds of nighttime lift, and 3.1 million pounds of daytime lift.

**Track and trace:** The contractor must have the information technology infrastructure to track and trace each and every individual handling unit to meet the Postal Service's operational and customers requirements.

Justification at 2–3.

The Justification evaluated plaintiff and came to the following conclusion:

> The significant capital expenditures that will be required to replace/augment its fleet make it unlikely that Emery will be able to replace its fleet and meet the Postal Service's national network requirements at a cost-effective price, without relying upon postal payments for a significant portion of their overall revenue.

Justification at 9.

The PwC Analysis purported to present a "fact-based analysis of many of the carriers with whom the [USPS] could contract for air transportation services." PwC Analysis at 1. The data in the PwC Analysis were "obtained from a number of publicly available sources,[24] which are believed to be accurate and reliable." *Id.*

As explained above, the PwC Analysis utilized seven "filters" that assessed the attributes of the carriers against the USPS's requirements. The PwC Analysis concluded that the USPS should "utiliz[e] a shared-lift network with a single, national vendor that currently operates a network for its own products and already bears a significant portion of the resulting operating and overhead costs." PwC Analysis at 22. The PwC Analysis noted that "[plaintiff]'s declining market share and the significant capital expenditure that may be required to replace/augment its fleet make it unlikely that the carrier will be able to meet the Postal Service's network requirements at significant cost savings and at the same time [sic] without being overly dependent on Postal Service payments for a

significant portion of the airline's revenue." PwC Analysis at 31. Mr. Takis testified that "by the end of August time frame," the team working on the PwC Analysis had reached the conclusion that plaintiff was eliminated after the second filter (Network Scope (National Reach)) and that intervenor was the only supplier remaining after the sixth filter (Business Compatibility). Hearing Tr. at 258.

Defendant maintains that plaintiff was eliminated from consideration because it could not meet the requirements for a shared network, network scope and scale, track and trace, or financial stability. *See, e.g.,* Defendant's Counter–Statement of Facts filed Mar. 8, 2001, ¶¶ 136, 153, 156, 158, 165. However, elsewhere defendant admitted to three reasons: Network Scope (Airports and Cities), Network Scale (Aircraft Capacity and Cost), and Information Technology (Track and Trace). *See id.* ¶ 59.

Plaintiff attacks the USPS's conclusions, asserting that the Justification relied on only "two grounds" (number of airports served and age of fleet) and that the PwC Analysis relied on only one "additional ground" (track and trace) to exclude plaintiff. Pl.'s Br. filed Mar. 8, 2001, at 24. Plaintiff emphasizes that no other factors were cited as the reasons to exclude plaintiff. Incredibly, plaintiff also asserts that the ability to provide a shared network was not a requirement of the Justification. Plaintiff dismisses any argument that a shared network was a requirement in the Justification or that plaintiff did not meet additional requirements as *"post-hoc* rationalizations." *Id.* at 29. At bottom, plaintiff maintains that "[t]he only issue is a cost trade-off," *id.* at 33, and that the USPS's other considerations were irrational. The court is utterly unconvinced.

Providing a shared network was a requirement in the Justification, and plaintiff was excluded on this ground. One of the USPS's national network requirements was "a move toward shared lift networks," Justification at

---

24. These included SEC filings, Dow Jones Interactive Company Reports, websites, JP Fleets Database, the *Official Airline Guide*, and *Aviation Week Magazine*. Mr. Takis spoke telephonically with customer service representatives from DHL Worldwide Express, BAX Global, UPS, and intervenor about the compatibility of their containers with USPS requirements. Although plaintiff was not among them, Mr. Takis was able to obtain this information from plaintiff's website.

1, and the USPS concluded that it was unlikely that plaintiff could "meet the [USPS]'s national network requirements at a cost effective price, without relying upon postal payments for a significant portion of their overall revenue." *Id.* at 9. This was a sound decision confined to agency discretion and was not irrational. The publicly available information cited in the PwC Analysis showed that plaintiff does not maintain a substantial business carrying its own mail, has only a 0.7% market share of domestic shipments, and could not provide the USPS with a viable shared-lift network. "[Plaintiff's] protest is akin to that of a disappointed bidder in a procurement for off-the-shelf computer software contending that the Government should have given the bidder the opportunity to develop equivalent software. The [USPS] rationally chose [intervenor's] 'off-the-shelf' network rather than [plaintiff's] 'developmental' effort." Def.'s Br. filed Feb. 23, 2001, at 13. Other grounds appear in the Justification on which the USPS excluded plaintiff, including network scope and scale, track and trace, and financial stability. While these were equally rational grounds to exclude plaintiff, based on publicly available information, it is only the shared-network ground that plaintiff desperately insists did not exist in the Justification. Plaintiff's premise is incorrect. The requirement of a shared network was central to the Justification and the USPS's plan, and the USPS rationally concluded that plaintiff could not meet it.

Plaintiff also makes a number of arguments that relate to its own potential ability to perform the contract, which plaintiff presents in a number of guises: Plaintiff contends that it could have served the required airports under the sole-source contract by the time of contract performance, even if it did not serve those airports when PwC performed its analysis; plaintiff claims that the USPS irrationally failed to consider what other carriers might do if they were awarded

the $100,000,000 "network expansion" fee that intervenor is to be paid under its contract; plaintiff asserts that the USPS did not consider the potential for plaintiff to undertake a joint venture with another carrier in order to meet the contract requirements.

When deciding whether to award a contract to a potential sole-source supplier, procurement officials are not required to speculate as to every possible scenario that might enable the industry players to qualify. Whatever potential ability plaintiff had to perform the contract is presented with the benefit of hindsight and falls well short of discharging the burden required to set aside a procurement decision. A protestor must prove the arbitrary and capricious nature of the Government's actions by a preponderance of the evidence. *See CACI Field Servs.,* 854 F.2d at 466; *Ellsworth Assocs.,* 45 Fed. Cl. at 392. The procurement decisions under review are (1) a sole-source award (2) to intervenor.

Plaintiff next argues that the USPS could have assured itself of plaintiff's ability to perform. Even after the USPS had decided to award the contract to a single national carrier, plaintiff maintains that the USPS or PwC could have obtained accurate data about plaintiff. For example, when PwC calculated the number of airports that plaintiff served, PwC should have contacted plaintiff's representatives instead of relying on public information, such as the *Official Airline Guide.* As another example, plaintiff claims that it has provided mail transportation at a lower cost [25] than the amount negotiated with intervenor. Had plaintiff been given "timely notice of the requirements," Pl.'s Br. filed Feb. 23, 2001, at 19, it could have developed a proposal; however, the USPS failed to offer plaintiff an "opportunity to dialogue," *id.,* with the USPS about the latter's needs. Given the chance, plaintiff asserts, it could have offered more accurate data and demonstrated its ability to perform.

---

25. Plaintiff states that it transports mail for $.65 per pound on its current dedicated network. *See* Declaration of Kent T. Scott, Feb. 22, 2001, ¶ 13. Mr. Scott does not explain how he arrived at this figure, instead merely stating "[W]e have calculated the actual cost of our dedicated systems to

the [USPS]." *Id.* Even assuming this is a correct figure, plaintiff makes no allegation as to what the future cost to transport mail on a dedicated network would be over the contract term, taking into account inevitable cost increases, which Mr. Takis's projection includes.

All of these arguments are premised on the proposition that a competitive procurement assesses more accurate information than a non-competitive one. Mr. Takis decided to use public information so as to preserve the ability of the USPS to award the contract on a non-competitive basis. Doing so did not violate the Purchasing Manual § 3.2.2.b.1, which states that "[p]urchase teams must ensure that any market research undertaken for a specific purchase provides for fair and equal treatment of all potential suppliers." As long as PwC used only publicly available information to evaluate all potential suppliers (and no persuasive evidence has been offered to show the contrary),[26] the decision not to query an individual carrier was neither arbitrary nor irrational and not a violation of an applicable procurement regulation. *Essex Electro Engineers, Inc. v. United States,* 3 Cl.Ct. 277 (1983), is not to the contrary. After bid opening the agency obtained from the manufacturer incomplete literature showing that plaintiff's equipment did not comply with a specification. The successful protestor in *Essex* proved that the agency failed to consider the remaining pages that plaintiff then proffered to substantiate its responsiveness. The agency also acted unreasonably in going beyond plaintiff's bid and using literature submitted by a competitor to reject plaintiff's equipment. *Essex* stands for the proposition that an agency decision cannot be based on information that is not contained in the bid unless the bidder is given an opportunity to respond.

Plaintiff's argument would require an agency to publish its requirements and gather information from all potential carriers before deciding whether to award a non-competitive contract. In other words, an agency would undertake many of the steps associated with competitive bidding in order to sustain a non-competitive award. This was exactly Mr. Strange's rationale for approaching the procurement on a sole-source basis:

> [T]he traditional government procurement model of putting out a detailed statement of work and getting detailed proposals including price back from multiple suppliers, the negotiating with multiple suppliers and selecting a best value award was basically impractical in this case.

> What I have learned is to do these purchases appropriately and reasonably, that you really need to go through a process of cooperatively defining the network, all the hand-offs, the exchanges, the critical entry times. And only as you do that can you come to a reasonable basis for price.

> So the only way I see to effectively do this—and I believe this is the way they are primarily done in the private sector—is to select a supplier and go through that process. And only if you are unsuccessful in coming to an agreement on price would you look at other suppliers.

> So I think you are driven to establish through some process ... who you think the most capable supplier for your needs [is] and entering into discussions with that supplier. I think that is precisely what we did in this case and we did on the basis of very extensive market analysis.

Hearing Tr. at 172–73.

If the USPS rationally concluded that a non-competitive award was in its best interests, then its decision not to consider or gather information directly from all carriers also was rational.

The cases offered by plaintiff in support of its position are distinguishable from the case at bar. In *Magnavox Electronic Systems Co. v. United States,* 26 Cl.Ct. 1373, 1385 (1992), the court struck down a sole-source justification when, prior to award, the agency's own personnel had concluded that it contained flawed data. It was in that instance that the court found that a failure to conduct a further inquiry with a potential supplier was irrational. *See id.* In *Wetsel–Oviatt Lumber Co., Inc. v. United States,* 40 Fed.Cl. 557 (1998), the court addressed an agency's refusal to conduct an inquiry with the successful bidder when the agency was preparing a recommendation to cancel the competitively awarded contract, not a sole-source justification. These cases do not establish, as plaintiff asserts, an affirmative duty on the part of a contracting agency to

---

**26.** *See supra* note 24.

make inquiries with all potential suppliers before awarding a sole-source contract.

Plaintiff also argues that it was irrationally excluded because the USPS improperly evaluated plaintiff's financial ability. Specifically, plaintiff claims that the USPS did not consider the resources of plaintiff's parent company, CNF. The PwC Analysis evaluated plaintiff's financial stability independently. The Justification also did not include CNF's resources when evaluating plaintiff. Nothing irrational attaches to this approach, as the agency could conclude that an eventual awardee must perform the sole-source contract on its own. Unlike the situation in *T & S Prods., Inc. v. United States,* 48 Fed.Cl. 100 (2000), where an offeror implicitly represented that its parent was willing to assist in performing the contract, PwC had no basis to infer CNF's support.

Plaintiff takes the position that the USPS irrationally concluded that it would award a sole-source contract to intervenor even though intervenor would be unable to serve the entire air transportation network used by the USPS. The USPS's system of dedicated networks with airplane space is used exclusively for mail. As the Justification explains, the system of dedicated networks was developed piecemeal, so that different carriers operate different parts of the network. The USPS recognized that the dedicated networks were inefficient, expensive, and somewhat unreliable. The cost of dedicated networks was projected to increase in recent years and the networks lacked a cohesive tracking system. The USPS also recognized that the ASYS aircraft delivered only 60% on-time performance because some passenger airline routes have changed and because mail is not readily transferred at commercial air hubs.

One of the nine requirements listed in the sole-source Justification was a "[d]ecrease in the Postal Service's reliance on dedicated air transportation . . . and a move toward shared lift networks." Justification at 1. Given this requirement, plaintiff argues that it was irra-

tional for the USPS to award a sole-source contract to an air transportation provider unless that provider completely and instantly could obviate the need for any further reliance on the current dedicated system. Plaintiff points out that, although the Justification contemplates that the shared network would carry all First Class mail, the ASYS network still will be used to transport this mail and may be used more extensively and that the USPS does not have a plan for the mail that intervenor will not be able to carry on its shared network. According to plaintiff, a sole-source award that does not completely account for this "spill" is irrational.[27]

Plaintiff's argument omits the key characteristic of the Justification that the USPS will "move toward shared lift networks." The Justification does not state that the USPS must predicate a sole-source award on a carrier that could allow the USPS to cease use of its dedicated network. It was rational for the USPS to transfer some of its mail transportation to a shared network. Plaintiff's argument would hamstring the USPS to its current system until the USPS could find a wholesale replacement for the dedicated network. USPS officials are free to explore solutions as they see fit, provided they do so on a rational basis. Procurement, even on a sole-source basis, contemplates a compromise between what an agency desires and what is available. It is not irrational for agency officials to embrace an objective that cannot be attained wholly at the outset, as long as the objective is so qualified.

### 2. *The PwC Analysis*

Plaintiff charges that the PwC Analysis used by the USPS in making the sole-source award is so flawed as to render the USPS's decision irrational. The PwC Analysis is a 49–page document (with voluminous appendices). The PwC Analysis was presented as an appendix to the Justification. The Justification is the document that was signed for the USPS by Messrs. Vogel and Young and principally Mr. Strange. The PwC Analysis

**27.** Related to plaintiff's "spill" argument is plaintiff's assertion regarding "volume density." *See* Pl.'s Br. filed Feb. 26, 2001, at 34–36. The court does not retread the technical information relat- ing to mail volume density, as plaintiff's arguments distill to questioning the amount of mail that can or should be carried under the contract.

is not signed by USPS officials and lists the following disclaimer on the first page:

> This document does not constitute a sole-source justification. Rather, it presents a fact-based analysis of many of the carriers with whom the Postal Service could contract for air transportation services. The arguments for a sole-source justification are contained in a separate legal document.
>
> The data contained in this report have been obtained from a number of publicly available sources which are believed to be accurate and reliable. No systematic audits have been performed to verify the accuracy of these data.

According to plaintiff, the PwC Analysis contained factual errors related to anticipated aircraft costs, track and trace requirements, crew costs, and maintenance costs. The Justification relied on this information.

### 1) Anticipated aircraft costs

When evaluating its current dedicated network, the USPS attempted to predict how aircraft costs were likely to increase. The USPS noted in its Justification a number of factors that were likely to result in increased aircraft costs under the dedicated network: The aircraft in the dedicated network "are reaching the end of their useful life with significant increases in maintenance costs on the horizon," Justification at 5; if passed, Stage IV noise regulations would require expensive retro-fitting or elimination of some of the 727s in the dedicated network, id.; replacement planes for the dedicated fleet "could cost anywhere from $20 million to $35 million, depending on a large list of variables . . . which will vary substantially in each individual case." Id. at 4 n. 6. The Justification also stated that "it is anticipated that the Postal Service would have to absorb a significant amount of these increased costs due to increased maintenance and plane replacement." Id. at 5.

Stage IV noise restrictions are a series of aircraft noise restrictions that would entail the replacement of current Boeing 727s. Al-

though these standards are not currently in place, and when they will be implemented is unknown, they were a factor in the PwC Analysis. The PwC Analysis assumed that Stage IV restrictions would be implemented in 2005 and that current dedicated carriers (like plaintiff) would be required to replace 50% of their fleets due to aircraft aging and Stage IV noise restrictions. *See* Declaration of William M. Takis, Mar. 7, 2001, ¶¶ 11–14.[28] Plaintiff asserts that "Stage IV noise regulations will not be applicable to existing fleets within the contract period." Pl.'s Br. filed Feb. 26, 2001, at 27. On this basis plaintiff attacks PwC's conclusion that 727s in plaintiff's fleet must be replaced.

While acknowledging that the timing of Stage IV requirements is unknown, plaintiff offers a conclusion from an organization of international governmental agencies that Stage IV noise restrictions for new aircraft would not be effective until 2006. Defendant counters with an industry news article, which reports that "[i]mplementation dates under consideration begin as early as 2002 for newly certificated aircraft and 2006 for the existing fleet as a commencement date for various phaseout plans under consideration." *Equipment Leasing Today*, 2000 WL 16163658 (Sept. 1, 2000). Neither of these documents was before the USPS when making its decision. Instead, PwC (and subsequently the USPS) made a factual assumption. That assumption was that Stage IV noise restrictions would have an impact on future aircraft costs. Factoring in potential costs based on the prospect of future legislation is not irrational. While plaintiff does make a salient point about the unpredictability of the legislative process, it is not sufficient to render the USPS's decision-making process arbitrary and capricious. PwC reasonably adopted 2005 as the Stage IV implementation year and performed its analysis accordingly. Moreover, the JP Morgan study concluded that even if Stage IV restrictions were not implemented, the USPS would still realize significant savings.

Plaintiff quarrels with the USPS's assumption that replacement aircraft for the dedicat-

---

**28.** Mr. Takis's declaration was submitted for purposes of litigation and constitutes material that was not before the USPS at the time the Justification was signed.

ed network would cost between $20 and $35 million per plane, taking the position that plaintiff could accomplish replacement for approximately $7 million per plane. Plaintiff first informed the USPS that it could replace its fleet in a January 4, 2001 letter to Mr. Young. However, plaintiff's price per plane assumes that plaintiff would have the revenue from another 10–year ANET contract to offset the cost of replacement. In other words, a condition to plaintiff's ability to procure replacement aircraft for $7 million each was the continuation of a dedicated network. The USPS cannot be faulted for not estimating aircraft replacement costs based on the very network it was trying to eliminate solely in order to improve plaintiff's standing. Plaintiff's argument regarding aircraft costs is rejected.

### 2) *Number of airports served*

Plaintiff argues vehemently that PwC irrationally eliminated plaintiff from consideration for a sole-source award because PwC concluded that plaintiff did not serve a sufficient number of airports to meet the USPS's needs. PwC relied on the *Official Airline Guide* (the "OAG") to establish the number of airports each evaluated carrier served. Plaintiff was listed with 60 airports, but offered its own data to show that it served 74. It may be true that the OAG was not accurate with respect to the exact number of airports that each carrier served. However, PwC's use of the OAG in its analysis and the USPS's reliance on that analysis are not rendered irrational by inaccuracy in the OAG itself. The OAG is an authoritive source and reliance thereon was reasonable.

### 3) *Track and trace requirements*

The Justification lists one requirement for an air transportation carrier under a shared-lift system as "Information technology (IT) infrastructure to support operational and customer track and trace requirements." Justification at 1.[29] Expounding on this requirement, Mr. Strange testified that it was "clearly important" to the USPS to have "informational technology" that had "track and trace down to the individual piece." Hearing Tr. at 167. This comported with Mr. Takis's understanding of the USPS's track and trace requirement. Mr. Takis stated that "the Postal Service desired an IT infrastructure from a carrier that was in place at the time and had the ability to track and trace individual pieces, not overall shipments ... but the individual pieces in that overall network." Hearing Tr. at 257. Mr. Takis determined that plaintiff lacked the required information technology capability.[30] At oral argument plaintiff finally was able to demonstrate that Mr. Takis's conclusion that plaintiff lacked track and trace capability down to the individual piece level was incorrect and that, as of the fall 2000 time frame, plaintiff could trace at the handling unit, which can include tracking at the piece level. However, plaintiff has not shown that Mr. Takis did not rely on publicly available information. In fact, the PwC Analysis cites to plaintiff's website in its decision on track and trace. Even assuming that the PwC relied on inaccurate information and could have obtained accurate information had PwC asked plaintiff directly, the decision to rely on publicly available data was rational.

---

**29.** Track and trace refers to the USPS's ability to track mail that is being shipped on its networks. Mail transported by air can be tracked a number of ways: 1) It can be tracked based on an individual "piece" of mail—for example, a single envelope, box, or oversized item (an "outsize"); 2) it can be tracked based on a "container" or a "handling unit," which contains a number of pieces; and 3) it can be tracked based on an overall shipment—for example, an entire plane carrying pieces of mail.

**30.** In her second declaration, Jodie Lanier, Information Technology Manager with plaintiff's parent company, explains that plaintiff was evaluated with respect to its Priority Mail contract with the USPS, based on a track and trace require-

ment that required plaintiff to scan containers and "outsides." Operational problems arose when plaintiff attempted to scan these items with bar codes, which required sorting through all packages to find the 10% with bar codes.

The testimony of Timothy E. Wendling, plaintiff's Vice President of Hub Operations, was also ambiguous. At the January 8 hearing, Mr. Wendling acknowledged that plaintiff did not track at the individual piece level, stating "[w]e have the ability to track and trace at the shipment level. So, for example, if we have a shipment that has three pieces, we track at the aggregate level of the shipment itself and not at the piece level." Hearing Tr. at 146.

#### 4) *Other costs*

Plaintiff attacks the basis for the PwC data that were the predicate for the cost savings of a shared network over a dedicated network. This argument echoes plaintiff's assertion that "[t]he only issue is a cost trade-off," Pl.'s Br. filed Mar. 8, 2001, at 33. Plaintiff maintains that due to alleged errors in the projected amount of cost savings of intervenor's shared network over a dedicated network, the USPS's decision to use intervenor's shared network was irrational. These errors relate to crew costs (the amount of money paid to flight crews), maintenance costs (upkeep costs for new and used aircraft), and fuel costs (the amount paid for fuel under a shared versus dedicated network).

Plaintiff characterizes the crew-cost figures used in the PwC Analysis as "far removed from reality," Pl.'s Br. filed Feb. 26, 2001, at 43, and denies that they have record support. Defendant concedes that "[t]he administrative record does not reflect the source of PwC's data," Def.'s Br. filed Mar. 8, 2001, at 16, and acknowledges that "error cannot be ruled out" with respect to PwC's estimate of crew costs. *Id.* Plaintiff's expert, Morris R. Garfinkle, estimates that defendant's crew costs are overstated by as much as $350 million. Declaration of Morris R. Garfinkle, Feb. 22, 2001, at 17. Defendant responds that this alleged error is "immaterial," noting that crew cost is "one cost element" and that intervenor's contract would still result in "large cost savings for the Postal Service." Def.'s Br. filed Mar. 8, 2001, at 16. Although the court is troubled by a possible error that could amount to 25% of the projected $1.358 billion savings under the shared network, to declare the agency's decision to award the contract irrational would amount to judicial second-guessing. When the award was approved by the Board of Governors on January 9, 2001, JP Morgan's contemporaneous presentation revealed that the reasons in favor of the award were that the arrangement with intervenor

— Replaces existing multi-carrier network

— Avoids significant future cost increases

— Provides consistent, reliable service

— Provides nationwide reach

— Enhances USPS image as quality player

— Supports future product growth strategies

JP Morgan tested the sole-source award under a number of scenarios and confirmed large costs savings. Certainly a possible error of such magnitude is not immaterial. However, even assuming that the error did occur, the projected savings still exceed $1 billion.

The USPS knew that the data in the PwC Analysis came from public sources and were unverified. It endeavored nonetheless to formulate its decisions based on public sources and accept the risks inherent in that approach. That some of the data were incorrect may reflect errors in executing the PwC Analysis, but, unless the consequences of the possible errors render the basis for the ultimate decision to contract irrational or unreasonable, a reviewing court should not disturb the result. This is especially true when the error implicates a matter of business judgment, such as the amount of projected savings compared with projected current costs over the long term.

> All the agency was required to do was present a reasoned analysis showing that the Government expects to receive benefits commensurate with the price premium it will have to pay. Although the analysis that the [agency's consultants and analysts] undertook undoubtedly has numerous assumptions and some large margins of error, we do not lose sight of the basic principle that, in making its analysis, the agency is essentially exercising its business judgment, albeit one involving taxpayers' money, and not conducting a definitive or all-inclusive study.

*Lockheed Missiles & Space Co. v. Dep't of Treasury*, 93–1 BCA ¶ 25,401, at 126,508, 1992 WL 512122, *aff'd*, 4 F.3d 955 (Fed.Cir. 1993) (footnote omitted).[31] Plaintiff's protest on this ground is denied.

---

31. The Federal Circuit affirmed this approach of reviewing the competitive procurement process

The PwC Analysis contains an estimate of future aircraft maintenance costs. The analysis states that maintenance costs will escalate at 12% per year for existing (older) aircraft and escalate at 6% per year for newly acquired aircraft. Plaintiff complains that the estimates of maintenance costs are "out of sync with industry practice and publicly available information." Pl.'s Br. filed Feb. 26, 2001, at 43. Mr. Takis's declaration, relying on a publicly available quarterly report for the third quarter of 2000, states that plaintiff's own unamortized maintenance costs for its fleet (which averages 31 years in age) increased more than 16% for the third quarter of 2000. Takis Decl. ¶ 45. Mr. Garfinkle tracks maintenance costs increases for 1990–2000, instead of extrapolating for the term of the contract to commence in 2001. In these circumstances the PwC approach in estimating maintenance costs for older aircraft was reasonable.[32]

Finally, with respect to fuel costs, intervenor's counsel during oral argument disputed plaintiff's claim that the USPS used different fuel prices when comparing the dedicated and shared networks. Defendant confirmed that the final price of 85 cents per gallon was used for calculations in both the shared-network and dedicated-network comparisons. *See* Takis Decl. ¶ 47. That this was the actual approach taken has not been refuted by plaintiff.

## IV. *Appropriateness of injunctive relief*

In addition to considering the merits of plaintiff's claim for a permanent injunction to prevent further performance of the sole-source contract with intervenor, the court must determine whether plaintiff will be irreparably harmed if relief is withheld, must balance the hardships to the parties, and assess where the public interest lies. *A.G. Schoonmaker Co. v. Resor,* 319 F.Supp. 933,

941, *rev'd on other grounds,* 445 F.2d 726 (D.C.Cir.1971).

Plaintiff has made the first showing. The USPS and plaintiff have agreed to terminate the ANET contract for convenience. More importantly, plaintiff will be foreclosed from receiving anticipated profits from what intervenor's president publicly has termed a "lucrative" contract. *See M. Steinthal,* 455 F.2d at 1302.

The balance of harms tilts in favor of the USPS. The sole-source award was a response to projections of the USPS's continuing financial decline, which also is projected to accelerate. This court is not in a position to find that the USPS made a poor business judgment to turn to a new solution for transporting mail as one response to its financial problems. The court only can rule on whether the USPS reasonably determined that proceeding with a sole-source contract with intervenor was in its best interests.

The balance does not tilt in favor of intervenor. Should the award decision be overturned, the amount of liquidated damages payable to intervenor is less than the costs to terminate the USPS's current contracts for mail transport via the network of dedicated carriers. Moreover, the first payment against the $100 million total will not be made to intervenor until March 31, 2001, so, should injunctive relief be proper, the time is at hand to upset contract performance and cause the least havoc with performance.

The public interest has two aspects, which the D.C. Circuit, as the court originating the concept of judicial review of contract awards, put most aptly: The balance is between the Government interest "in smooth and efficient functioning of the procurement process at the expense of the interests of the unsuccessful bidder in the integrity of the bidding process and equal access to the procurement dollar...." *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 846 n. 9

---

in *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955 (Fed.Cir.1993), stating: "[A] proposal which is one point better than another but costs millions of dollars more may be selected if the agency can demonstrate within a reasonable certainty that the added value of the proposal is worth the higher price." *Id.* at 960 (emphasis omitted).

**32.** Although Mr. Takis relies on information that was not before the USPS at the time the Justification was approved and the contract awarded, its purpose was to show that plaintiff's position is inconsistent with plaintiff's own experience.

(D.C.Cir.1982). Concern for the integrity of the procurement process is heightened in this case, because the functioning of the procurement system cannot be monitored by the public that seeks to do business with the USPS in an open competition. The USPS must justify the sole-source determination as in its best interests. Defendant urges the exigencies of the situation. Deployment must not be halted, argues defendant, or else the milestone for implementation of the new shared network, August 27, 2001, cannot be met, and, due to the inability to train pilots over the holiday season, the decline in performance and financial hemorrhaging will continue until at least spring 2002, the next date for implementation. The USPS itself must take responsibility for this precarious timing, for it chose to push the approval of the Justification, presentation to the Board of Governors, and execution of the Transportation Agreement up against the latest date for beginning performance. Nonetheless, the public interest is served in this case by a procurement process that meets the USPS's requirements.

Having reviewed the administrative record, as supplemented, and the record of these proceedings, the court concludes that the USPS had a reasonable basis for justifying the sole-source contract with intervenor as in its best interests. The process may have taken the form of a self-fulfilling prophecy, but it was soundly grounded in adequate market research, as well as a reasonable operational and financial analysis. The decision to rely on publicly available data was reasonable, because the USPS reasonably concluded that the process of obtaining carrier-supplied information would be tantamount to conducting a solicitation.

Although the court is concerned that the PwC Analysis cannot be defended with respect to all data and assumptions that impacted plaintiff and that bear on the reliability of the financial projections, the record reveals a number of wholly substantiated grounds upon which plaintiff was eliminated. The financial projections are a business judgment and properly left to the USPS officials who are charged with assessing whether the arrangements with intervenor represent a

wise business decision. What the court confidently can conclude is that the multiple objectives that prompted this venture and the USPS's reasons for selecting a sole-source procurement to achieve these objectives are soundly supported in the record, are rational and reasonable, and neither arbitrary nor capricious.

### CONCLUSION

1. Defendant's motion to dismiss for lack of jurisdiction is denied. Plaintiff's cross-motion for summary judgment is denied. The Clerk of the Court shall enter judgment for defendant and intervenor.

2. By March 28, 2001, the parties shall file requests for deletion of protected/privileged material before the court issues its opinion for publication.

**IT IS SO ORDERED.**

No costs.